UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | No. 26-mj-41-AJ |
| BLU ZEKE DALY, a/k/a CULLAN ZEKE DALY, | ) ) ) | |
| Defendant. | ) ) | |

## GOVERNMENT'S MOTION FOR DETENTION

The United States moves to detain the defendant pretrial pursuant to 18 U.S.C.
§ 3142(f)(1)(A) because there are no conditions of release or combination of conditions that will
reasonably assure the appearance of the defendant as required and safety of any other person and
the community.

## I.      Background

On February 24, 2026, the Court signed a complaint charging Daly with the Attempted
Murder of a Federal Officer in violation of 18 U.S.C. § 1114(a)(3) and Assaulting a Federal
Officer with a Dangerous Weapon in violation of 18 U.S.C. §§ 111(a) & (b).  [ECF No. 1]
Shortly before midnight on February 22, 2026, a Border Patrol officer driving a marked car saw
a gray Honda Civic in Stewartstown, New Hampshire.  Stewartstown is adjacent to Beecher
Falls, Vermont, which itself borders Canada.[1]

---

[1] The following two images are from Google Maps.



Daly was the driver and sole occupant of the Civic.  The Civic was registered to Daly's significant other.  The officer followed the Civic because Daly was driving at a late hour in an area known for illegal border crossings.  Daly drove suspiciously in an apparent attempt to lose the officer.  For example, at one point Daly stopped at a gas station but the Civic's gas cap was located on the wrong side of the pump.  Eventually, the officer activated his emergency lights and initiated a traffic stop.

During the stop, the officer first approached Daly on the driver's side.  The officer identified himself as a Border Patrol agent.  Daly, a Manchester resident, claimed to be heading to ski at Sunapee, New Hampshire.  Sunapee is an approximately three-hour drive south of Stewartstown.  The officer offered to help Daly get directions to Sunapee.  The officer asked Daly some background questions and requested a form of identification.  Daly eventually provided a paper New Hampshire temporary license with the name "Blu Zeke Daly."  The officer returned to his vehicle, entered Daly's information into his computer, and found no exact hits matching "Blu Zeke Daly" with the defendant's date of birth.  However, the officer saw two

2

National Crime Information Center (NCIC) possible matches.  A second Border Patrol agent then arrived on the scene.

The first officer (who pulled Daly over) then walked back to the Honda Civic to speak with Daly and asked whether Daly had used any other names.  The defendant said yes and gave the name Cullan.  The officer walked back to his car to check his computer.  Without warning, Daly immediately sped away, heading north on U.S. Route 3.  The officer's supervisor directed the officer to pursue at a safe distance without emergency lights on.  Daly's speed varied depending on road conditions, but the officer recalled Daly reaching a speed as high as 90 miles per hour.  The officer followed Daly until Daly reached the Port of Entry in Pittsburg, New Hampshire, at approximately 12:48 am.  The Port of Entry is directly south of Chartierville, Quebec, Canada.



Because of the late hour, the Port of Entry was closed and the gate was locked.  Daly stopped the Civic in front of the locked gate.

The officer activated his emergency lights and sirens, stopped his own car a short distance behind the Civic, exited his vehicle, and yelled repeatedly at Daly to park the Civic and exit.[2] The officer remained standing by his own car behind the opened driver's door. Daly's driver's window was down.



Daly did not comply, did a U-turn, and drove a short distance until the Civic and officer's car were right next to each other. The officer noted that Daly's face looked furious. Daly braked and held a handgun out. Daly aimed and fired a handgun through the rolled-down driver's window when the Civic had slowed.

---

[2] The below stills are from footage obtained at the Pittsburg Port of Entry. The video is timestamped and was produced to defense counsel under Bates number USANH-0000001.



Daly missed despite the short distance between Daly and the officer. The Government is still awaiting the results of a shoot reconstruction performed by the FBI. However, it appears the bullet struck the right-side "B" pillar dividing the front seats from the back seats before a fragment fell into an area beneath the front passenger door handle.[3]



---

[3] The following two images correspond to Bates numbers USANH-304 and USANH-299.

5



After firing, Daly accelerated to get away.  The officer fired his service weapon in response as Daly was speeding off.  The officer fired several times as he was standing next to his own vehicle.  One of the officer's bullets passed through the rear windshield of the Civic and struck Daly in the head.  Daly lost control and crashed into a snowbank.

The officer did not initially know whether Daly was still armed and remained by his car for several minutes until backup arrived.  In the interim, the officer radioed for immediate assistance and reported the shooting.  Soon, additional law enforcement officers responded to the scene and, after confirming Daly was incapacitated, provided emergency aid.  An ambulance then transported Daly to a hospital for further medical care.  Daly has since been continuously hospitalized and under FBI custody.

Law enforcement recovered a Smith & Wesson SD9 2.0 handgun and ammunition from the Civic.  A firearms trace showed Daly had purchased the handgun on November 7, 2024.  Law enforcement also recovered a spent casing from the Civic matching Daly's Smith & Wesson handgun.

6

## II.    Legal Framework

The Government moves for detention under 18 U.S.C. § 3142(f)(1)(A), which allows the Government to seek detention in a case involving "a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed."  It is indisputable that Attempted Murder of a Federal Officer and Assaulting a Federal Officer with a Dangerous Weapon are crimes of violence.  Moreover, the Attempted Murder of a Federal Officer is an enumerated offense under § 2332b(g)(5)(B) for which the maximum penalty exceeds 10 years.

Because the defendant is charged with the Attempted Murder of a Federal Officer, the Court must presume, subject to rebuttal by the defendant, that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(C) (cross-referencing 18 U.S.C. § 2332b(g)(5)(B)).  If the defendant rebuts the presumption, the Government bears the burden of showing dangerousness by clear and convincing evidence, and risk of flight by preponderance of the evidence.

## III.    Analysis of Bail Factors

In evaluating a motion for pretrial detention, Section 3142(g) directs the Court to weigh the following specific criteria: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).  The Government addresses each in turn.

### A.    Nature and Circumstances of the Offenses

Daly is charged with two offenses, including Attempted Murder of a Federal Officer. The defendant fired a gun at a law enforcement officer at a short distance.  It is only through

sheer luck that Daly missed and the officer is alive today. This is one of the most serious violent crimes imaginable, and courts regularly order detention in homicide cases. *See United States v. Zhang*, 55 F.4th 141, 144 (2d Cir. 2022) (affirming district court's declining to revisit detention order where defendant was charged in murder-for-hire scheme); *United States v. Smith*, 79 F.3d 1208, 1210-11 (D.C. Cir. 1996) (affirming pretrial detention order where defendant was charged with murder).

Moreover, the Court should consider the context of the shooting. Daly was first encountered driving someone else's car (illustrating access to resources) in Stewartstown, New Hampshire, near the Canadian border. Daly's purported reason for driving in Stewartstown— that Daly somehow got lost on the way to Sunapee from Manchester—stretches credulity. After fleeing law enforcement, Daly then drove north on U.S. Route 3 until reaching the Pittsburg Port of Entry, mere feet from Canadian territory. Under the circumstances, it is reasonable to infer that the defendant was attempting to flee to Canada to evade law enforcement. Daly stopped only because the border gate was locked. And Daly did not listen to the officer's orders to get out of the Civic. Instead, Daly tried killing the officer and driving off. This further demonstrates the risk of flight.

In addition, the Government preliminarily calculates that the defendant faces a Guidelines range as high as 135-168 months if convicted at trial. The magnitude of this potential sentence reinforces the risk of flight. *See United States v. Gumora*, 454 F. Supp. 3d 280, 290 (S.D.N.Y. 2020).

### B.      Weight of the Evidence

The evidence against the defendant is strong. At trial, law enforcement would testify about the initial encounter with the defendant in Stewartstown and the defendant's flight. Audio

recording from the victim officer's radio and video footage obtained from businesses along U.S. Route 3 will corroborate the pursuit up to the Pittsburg Port of Entry. And video footage from the Pittsburg Port of Entry confirms the sequence of events surrounding the shooting, including the officer's activating his emergency lights, Daly's attempt to flee, and Daly's deliberate braking to aim and fire the gun at the officer.

### C.  History and Characteristics of the Person[4]

The Government understands the defense is centering its release argument on the defendant's medical issues and physical rehabilitative needs. However, as of this writing, the defense has not yet provided the Government with medical records regarding Daly's current condition or diagnosis.

The Court should not give the medical argument significant weight at this juncture for three reasons. First and foremost, for all the reasons set forth in this motion, the bail factors in aggregate strongly weigh against release given Daly is facing an attempted murder charge and tried to flee law enforcement.

Second, the medical record is incomplete. The Government does not dispute that Daly was gravely injured in the shooting. But defense counsel has informed the Court that Daly's current hospital stay is winding down. Defense counsel further informed the Court that they are working to place Daly with a local physical rehabilitation center for a few weeks, and that Daly already received some physical therapy. The Government understands the defense will produce a social worker to testify concerning the proposed rehabilitation programming. But the social worker is not a medical professional able to opine on Daly's physical and medical needs. And

---

[4] The Government reserves the right to supplement its argument based on the forthcoming bail report from Pretrial Services and medical evidence.

the Government will require time to review Daly's medical records, once received, to appropriately evaluate defense counsel's proposal.

Third, the defense has provided no evidence that Daly cannot obtain appropriate medical and/or rehabilitative services while in custody.  The undersigned AUSA has consulted with the Acting U.S. Marshal for the District of New Hampshire.  The Marshals have represented that they are able to guard Daly in a local hospital or rehabilitation center for the immediate future. Therefore, custody is no bar to Daly's receiving continued medical care.  Later, the Marshals would move Daly into an appropriate incarcerative setting commensurate with Daly's health needs.  That exact setting will depend on Daly's medical records, which the Marshals' medical staff will need to review.  Preliminarily, however, the Acting U.S. Marshal (after consulting with the Marshals' Prisoner Operations Division) identified potential long-term custodial medical rehabilitation centers in South Carolina and Texas that would meet Daly's medical needs as proffered by defense counsel.

### D.    Danger to the Community if Released

Daly is facing an attempted murder charge for nearly killing a law enforcement officer. Daly fled from a traffic encounter, drove at high speeds to the Canadian border, and ultimately fired a handgun at a uniformed Border Patrol officer after he had gotten out of his car.  That alone underscores the incredible danger to the community if the defendant is released.  The defendant's attempted flight also shows the defendant poses a serious risk of non-appearance.

## IV.    Conclusion

The defendant cannot rebut the presumption of pretrial detention in this case.  In the event the defense intends to rely on medical records to do so, a continuance of the detention hearing may prove necessary.  During such time, the defendant should remain at the hospital in

10

the custody of the U.S. Marshals.

There are no conditions of release, or combination of conditions, that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community.  Accordingly, the Government requests the Court detain the defendant pending trial in this matter.

ERIN CREEGAN
United States Attorney

Dated: April 22, 2026          By:     /s/ Alexander S. Chen
                                       Alexander S. Chen
                                       Assistant U.S. Attorney
                                       53 Pleasant Street, 4th Floor
                                       Concord, New Hampshire 03301